IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRELL LAMONT HUBBARD,　)
　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　 )
　　　　　　　　　　　　　)　CASE NO. 1:11CV00716
v.　　　　　　　　　　　　)
　　　　　　　　　　　　　)
TRAVIS D. BOHMAN, et al., )
　　　　　　　　　　　　　)
　　　　Defendants.　　　　)

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on Defendant's motion for summary judgment. (Docket Entry 21). Plaintiff has filed a response. (Docket Entry 25.) Defendants replied to Plaintiff's response. (Docket Entry 30.) For the reasons that follow, Defendants' motion for Summary Judgment should be granted. Plaintiff's Section 1983 action should be dismissed as it is barred by the three year statute of limitations. The malicious prosecution claim and intentional infliction of emotional distress claim are defeated by the existence of probable cause for the entry of Plaintiff's residence and his arrest.

This is an action seeking damages under 42 U.S.C. § 1983 for the alleged unlawful entry and search of Plaintiff's residence and his subsequent criminal prosecution. Defendants Travis D. Bohman, Jeffrey L. Starling, Roger Allen, and Tim Thompson were all Richmond County Sheriff's deputies who personally participated in some or all of the alleged events. They are all sued in both their individual and official capacities. Defendant Dale B. Furr was the Richmond County Sheriff when the events occurred and is sued in his official capacity only. The two remaining Defendants are Richmond County and the Sheriff's surety, the Ohio Casualty Insurance Company.

1

## STATEMENT OF FACTS

On January 25, 2007 Defendants Travis Bohman and Jeffrey Starling worked as detectives with the Vice/Narcotics Unit of the Richmond County Sheriff's Office. On that date, Bohman received information from a reliable confidential informant that Walter Spencer, aka "Little Walt," a known drug dealer, was driving to a residential location in the City of Hamlet to deliver a kilogram of cocaine to an unknown subject. The reported route of travel was going to be down Green Lake Road from Ellerbe towards Hamlet. Little Walt was reportedly traveling with his sister, Christina Morrison, and her husband, Tommy Morrison, in a bluish green Ford Explorer bearing North Carolina license plate number VYN-1615. (Def.'s Mem. Supp. Summ. J., Ex. 1, 2, ¶ 2, Declarations of Travis Bohman and Jeffrey Starling, Docket Entries 22-1, 22-2.)

Bohman shared this information with Starling, who was the Unit's lieutenant, and it was decided they would try to locate the Explorer and contact its occupants. The Explorer was spotted and stopped by deputies. The Explorer's only two occupants were Christina Morrison in the driver's seat and Tommy Morrison in the front passenger seat. (Bohman and Starling Declarations, ¶ 3.) Bohman proceeded to interview Christina away from Tommy, during which time she admitted there were in fact "drugs" in the Explorer. (Bohman Decl., ¶ 3.) The kilo of cocaine was recovered from the passenger floorboard, and Tommy admitted he was delivering it to "D. Hubb," an aka for Plaintiff Darrell Lamont Hubbard, at Plaintiff's "old house" in Hamlet. The physical address of the house was 402 West Ave. (Bohman Decl., ¶ 4; Starling Decl., ¶ 3.)

2

Plaintiff was already known to the deputies as a convicted drug dealer who was reportedly again trafficking in cocaine. In fact, the Sheriff's Office had previously tried surveillance on Plaintiff but it was unproductive. Because Morrison wanted to fully cooperate with the deputies' investigation, he agreed to make a controlled delivery of the cocaine to Plaintiff, and he was outfitted with an electronic listening device or "wire." Morrison said he was comfortable doing this, as he had made prior cocaine deliveries to Plaintiff and was used to dealing with him. Bohman and Starling discussed with Morrison that he was to simply enter the residence, deliver the cocaine in exchange for what was expected to be a large sum of cash, and then leave. He was told not to hang around or otherwise remain at the residence. Morrison stated that in his past cocaine deliveries to Plaintiff he was always in and out of the house in less than five minutes. (Bohman Decl., ¶ 5; StarlingDecl.,¶4.)

The operational plan was for Morrison to drive the Explorer accompanied by Bohman and Detective Roger Allen in the back seat. Lt. Starling and Detective Tim Thompson would follow in a separate vehicle and park on a nearby street to monitor what was said over the wire. The deputies agreed that once Morrison successfully delivered the cocaine to Plaintiff in exchange for the purchase money, they would detain Plaintiff, secure the residence, and obtain a search warrant. (Bohman Decl., ¶ 6; Starling Decl., ¶ 5.)

The deputies followed as Morrison drove to 402 West Avenue in Hamlet. Upon arrival, Morrison pulled to the rear, got out, and walked up the back steps with the kilo of cocaine and knocked on the door. The door opened and Morrison went inside. (Bohman Decl., ¶ 7.) At the same time, Lt. Starling and Detective

3

Thompson parked on an adjacent street and prepared to listen to the audio receiver for the wire worn by Morrison. (Starling Decl., ¶ 6.) Once Morrison went inside the house, Bohman and Allen exited the Explorer and went to the back steps to wait for the sale to take place. (Bohman Decl., ¶ 7.)

The only words ever picked up on the wire were the initial greeting at the back door when Plaintiff let Morrison inside. Since the wire appeared to fail at that point, Starling maintained radio contact with Bohman who reported he could hear voices inside the house, but could not make out what was being said, nor could he see inside. (Bohman Decl., ¶ 7; Starling Decl., ¶ 6.. Based upon Starling's prior experience with numerous controlled buys, and especially given his admonition to Morrison to get out quickly, he fully expected Morrison would be inside the house with Plaintiff no more than 2-3 minutes at the most. When seven minutes elapsed with Morrison still inside, and with Bohman unable to ascertain what was occurring, Starling feared that perhaps Plaintiff had discovered Morrison was working for the police, such that Morrison was now in imminent danger of being seriously injured or killed. (Starling Decl., ¶ 6.) Starling therefore radioed Bohman to immediately enter the house to check on Morrison and to secure the premises, and Starling and Thompson quickly drove there as well. (Starling Decl., ¶ 7.)

Bohman kicked open the back door and entered the house while verbally identifying himself as a deputy sheriff. He immediately saw Plaintiff standing in front of the kitchen counter wearing rubber gloves and unwrapping the kilo of cocaine. Plaintiff dropped the cocaine and turned to his left towards a black semi-automatic handgun lying on the counter. Fortunately Plaintiff did not reach for the gun, and he instead obeyed Bohman's commands to get down on the ground. (Bohman Decl.,

4

¶ 7.) Lt. Starling and Det. Thompson arrived around this time and also entered the kitchen. Starling saw both Morrison and Plaintiff lying on the kitchen floor. He immediately noticed the latex gloves on Plaintiff's hands, and he saw the kilo of cocaine on top of some newspaper on the kitchen counter. Starling knew that drug dealers frequently wear latex gloves while cutting and packaging their merchandise, including cocaine, and indeed several layers of packaging had been removed from the kilo and the final layer had a cut in it exposing the cocaine. Two knives were also lying nearby. (Starling Decl., ¶ 7.)

Detectives Thompson, Allen, and Jeff Cagle remained at the residence while Starling and Bohman left to obtain a search warrant. However, while en route, Bohman received a lead concerning the supposed source of the cocaine in Montgomery County, and he elected to follow up on that while Starling obtained the search warrant. Starling obtained the warrant (Starling Decl., Ex. 2-1, Docket Entry 22-2) and returned to the house. The following items were seized from the kitchen counter: the kilo of cocaine with a street value of approximately $25,000; a set of digital scales; a knife with cocaine residue; sandwich baggies with twist ties; some mail; and Plaintiff's wallet. The box for the scale was sitting on the opposite side of the stove from the cocaine. On an adjacent counter top were a loaded black Smith & Wesson .40 caliber semi-automatic handgun, Plaintiff's cell phone, and a vacuum sealer with bags. Another set of scales was located in the cabinet under the counter where the gun was located. A bottle of denatured alcohol was sitting on the stove and a box of baking soda was the only thing in the refrigerator. Starling located $20,200 in cash wrapped in plastic in a kitchen drawer, and another $230 in

5

Plaintiff's wallet. The rest of the house appeared to be under construction and there was no related evidence found in any other part of the house. (Starling Decl., ¶ 8.)

After Plaintiff was transported to jail, Lt. Starling appeared again before the local magistrate and swore out charges of trafficking in cocaine, maintaining a dwelling house for the purpose of selling cocaine, and possession of drug paraphernalia. An additional charge of being a felon in possession of a firearm was added several days later after Starling verified Plaintiff's status as a convicted felon. On or about January 29, 2007, the Sheriff's Office was served with a Tax Warrant issued against Plaintiff by the North Carolina Department. of Revenue in the amount of $72,565.18. Pursuant to N.C. Gen. Stat. § 102-42(a)(1), the Sheriff's Office surrendered to the Department. of Revenue the $20,430 seized as evidence on January 25. (Starling Decl., ¶ 9.)

Lt. Starling was the only member of the Sheriff's Office to charge Plaintiff with a criminal offense. At some point after the charges were filed, Plaintiff filed a motion to suppress the evidence which was granted by the superior court. As a result, the District Attorney elected not to proceed further with the case and the case was dismissed. (Starling Decl., ¶ 10.)

## DISCUSSION

### A. Standard of Review - Rule 56 Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the

evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson*, 477 U.S. at 250; *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id.* Moreover, the non-movant's proof must meet the substantive evidentiary standard of proof that would apply at a trial on the merits. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993), *modified on other grounds, Stokes v. Westinghouse Savannah River Co.*, 420,

7

429-30 (4th Cir. 2000); *DeLeon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1233 n.7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

## B. Section 1983 Claims Barred by Three Year Statute of Limitations

A three-year statute of limitations applies to Section 1983 claims predicated on federal constitutional violations allegedly committed in North Carolina resulting in personal injury. *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1161-62 (4th Cir. 1991) (applying three year limitation period of N.C. Gen. Stat. § 1-52(5) to claim alleging that city outdoor advertising ordinance amount to unconstitutional taking). Notably, section 1-52(3) applies the same three-year limitation period to claims alleging trespass upon real property. The incident sued upon here occurred January 25, 2007. The within action was not filed until September 8, 2011, over four and one-half years later. Because it is well settled that a Section 1983 claim against the police alleging unlawful warrantless entry and search accrues on the date of entry, Plaintiff's claim is time-barred as a matter of law. *See, e.g., Smith v. McCarthy*, 349 Fed. App'x. 851, 856-57 (4th Cir. 2009) (affirming dismissal of claims for excessive force and "illegal entry upon Plaintiffs' property" filed beyond the statute of limitations because the claims accrued immediately); *Price v. Philpot*, 420 F.3d 1158, 1163 (10th Cir. 2005) (accrual date for claim alleging unlawful search of residence was when police arrived and began search); *Triestman v. Probst*, 897 F. Supp. 48, 50 (N.D.N.Y. 1995) (claim alleging unlawful search of residence accrued on date of search since "[p]laintiff should have been aware when . . . the search [was]executed . . . that there was a possible violation of his rights"). Because the Section 1983 claim was not filed within the three year statute of limitations, this claim is subject to dismissal for

failure to state a claim. *See Washington v. Milner,*, Action No. 2:11cv140, 2011 WL 9977276 (E.D.Va Mar. 15, 2011) (citing *Jones v. Bock*, 549 U.S. 199, 215(2007).

### C. Warrantless Entry Justified by Exigent Circumstances

It is undisputed that the deputies entered the house out of concern for Morrison's safety when he failed to reappear after being inside for about seven minutes. Courts addressing this issue have recognized that concern for an undercover operative's safety may satisfy the exigent circumstances requirement for a non-consensual warrantless entry. *See, e.g., United States. v. Vasquez*, 953 F.2d 176, 181 (5th Cir. 1992) (warrantless entry into residence justified under exigent circumstances doctrine when drug suspects were about to figure out purported drug dealer was really a police informant); *United States. v. Thompson*, 720 F.2d 385, 387 (5th Cir. 1983) (warrantless entry into residence justified by reasonable fear for the informant's safety); *United States v. Williams*, 633 F.2d 742, 744 (8th Cir. 1980) (officers' concern for safety of confidential informant during narcotics transaction justified warrantless entry of residence under exigent circumstances doctrine).

### D. Qualified Immunity

It does not appear that the Fourth Circuit has addressed application of the exigent circumstances doctrine to a non-consensual warrantless entry based upon concern for an undercover operative's safety. Were there any Fourth Circuit authority contrary to the Fifth and Eighth Circuit's treatment of the issue, it would be the Plaintiff's burden to raise it. *Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."). As the Fourth Circuit has repeatedly noted, qualified

9

immunity is forfeited only where "the particular right [is so] clearly established in the law" that the particular manner in which the right applies to the factual context at hand is "apparent." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Given the absence of Fourth Circuit precedent clearly establishing the Defendants' warrantless entry was unlawful, they are entitled to qualified immunity as a matter of law. Accordingly, whether on the merits, on statute of limitations grounds, or on the basis of qualified immunity, Defendants are entitled to summary judgment on Plaintiff's claim challenging the entry and search of his residence.

### E. Malicious Prosecution Claim

Plaintiff also seeks damages for "malicious prosecution and infliction of emotional distress. . . ." (Complaint ¶ 1, Docket Entry 1.) As noted by the Fourth Circuit, there is technically "no such thing as a '§ 1983 malicious prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000). Instead, what has in the past been characterized as a Section 1983 malicious prosecution claim is "simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution--specifically, the requirement that the prior proceeding terminate favorably to the plaintiff. It is not an independent cause of action." *Id.* (internal citation omitted). However labeled, an essential element of such a claim is the absence of probable cause. *See Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005) ("In order for a plaintiff to state a section 1983 malicious prosecution claim for a seizure violative of the Fourth Amendment, we have required that the defendant have 'seized [plaintiff] pursuant to legal process that was not supported by probable cause and that the criminal proceedings[have] terminated in [plaintiff's] favor.'") (quoting *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 2005). Here, the favorable termination element was
10

Case 1:11-cv-00716-NCT-JLW Document 32 Filed 05/08/13 Page 10 of 15

satisfied by the dismissal of all criminal charges following the granting of Plaintiff's motion to suppress. The "lack of probable cause" element, however, cannot be satisfied.

Notably, the existence of probable cause presents an issue of law for the Court. *United States. v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011) (the "determination of probable cause is an issue of law . . ."). "'Probable cause,' for Fourth Amendment purposes, means 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (citing *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)). Here, Plaintiff was arrested and charged by Lt. Starling with cocaine trafficking and with being an ex-felon in possession of a firearm. At the time he charged Plaintiff, Lt. Starling knew the following: that Plaintiff had a prior felony conviction for drug dealing; that prior to January 25, 2007, the Sheriff's Office had received tips that Plaintiff was again trafficking in cocaine; that on that date deputies intercepted a kilo of cocaine on its way to Plaintiff for sale; that the kilo was successfully delivered to Plaintiff; that Plaintiff was observed unwrapping the kilo while wearing rubber gloves; that drug dealers frequently wear gloves while cutting and packaging their merchandise; that located in plain view in the same room with Plaintiff were a set of digital scales, a knife with cocaine residue, sandwich baggies with twist ties, and a loaded .40 caliber semiautomatic handgun. Significantly, in his responses to Defendants' Requests for Admission, Plaintiff does not dispute that he was caught standing in his kitchen in the presence of a visible quantity of cocaine and a handgun:

> 1. Admit that at the time of your arrest on January 25, 2007 you were in your kitchen wearing rubber gloves in the presence of a visible quantity of cocaine.

11

> **RESPONSE:** Plaintiff admits that he was arrested on January 25, 2007, while standing in the presence of a visible quantity of cocaine. Plaintiff does not recall wearing rubber gloves on that date and at that time.
> \*\*\*\*\*\*\*\*\*\*
> 3. Admit that at the time of your arrest on January 25, 2007 there was a black handgun in open view on the kitchen counter adjacent to you.
> **RESPONSE:** Admitted.

(Defs.' Mem. Supp. Summ. J., Ex. 3-1, Pl.'s Responses to Defs.' Reqs. for Admissions, Nos. 1 and 3.) Although Plaintiff states he "does not recall wearing rubber gloves," he does not deny wearing them. The Defendants' assertion that Plaintiff was in fact wearing rubber gloves thereby stands uncontroverted. *See I.V. Services of America, Inc. v. Inn Development & Management, Inc.*, 182 F.3d 51, 55 (1st Cir. 1999) ("mere lack of recollection does not suffice to create an issue of fact" that will defeat a motion for summary judgment); *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983) (inability to recall is only a "mere possibility" of a fact dispute and an insufficient basis to deny a motion for summary judgment).

By any objective standard, the foregoing information supplied more than enough probable cause to believe Plaintiff had committed the charged offenses. "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Because Plaintiff's arrest and prosecution were supported by probable cause, the purported malicious prosecution claim is untenable. Lastly, it bears mentioning that even if probable cause was an open question, the only proper Defendant would be Lt. Starling, as he was the only deputy who initiated criminal charges against Plaintiff. *See Best v. Duke University*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994) (to be liable for malicious prosecution the defendant must have "initiated the earlier proceeding"); *see also Jackson v. Brickey*, 771 F.

Case 1:11-cv-00716-NCT-JLW Document 32 Filed 05/08/13 Page 12 of 15

Supp. 2d 593, 606 (W.D.Va. 2011) (dismissing malicious prosecution claim against police chief because he was not "the arresting officer" nor did he attempt to influence the state's prosecution of the case); *Rice v. District of Columbia*, 626 F. Supp. 2d 19, 25 (D.D.C. 2009) (only the detective who "sign[ed] the criminal complaint" could be liable for malicious prosecution).

### F. Qualified Immunity as to All Defendants

Even where probable cause is lacking, a police officer may nonetheless receive the benefit of qualified immunity if, based upon "an objective assessment of the circumstances, an officer situated as was he reasonably could have believed that there was probable cause to arrest, *i.e.*, to believe that [the plaintiff] had committed criminal offenses." *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988). Here, a reasonable officer in Lt. Starling's position could certainly have believed that catching Plaintiff red-handed with the kilo of cocaine, freshly opened on his kitchen counter, with a handgun lying nearby, provided probable cause for the indicated charges. As the Supreme Court has made abundantly clear with regard to probable cause, qualified immunity obtains unless "it is obvious that no reasonably competent officer" would have acted similarly. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In other words, as long as "officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Id.*

### G. Liability of Richmond County

Under North Carolina law, deputy sheriffs are considered employees of the Sheriff, not the county, such that the county is without liability for their conduct. *See Clark v. Burke County*, 117 N.C. App. 85, 89, 450 S.E.2d 747, 749 (1994) (since sheriff's personnel are employed by the sheriff, not the county, injuries resulting from their actions "cannot result in liability" for the county); *see also Little v. Smith*, 114 F. Supp. 2d

13

437, 446 (W.D.N.C. 2000) (county cannot be sued for sheriff's deputies' alleged use of excessive force). Richmond County does not have final policy making authority over the employees of the Richmond County Sheriff's Department and cannot be held liable under an official capacity claim for the acts of the Sheriff's Department's employees. *Cranford v. Frick*, No. 1:05CV00062, 2007 WL 676687, at *8 (M.D.N.C. Feb. 28, 2007). For these reasons, Richmond County is entitled to dismissal as a matter of law.

### H. Liability of Sheriff's Surety

Plaintiff's claim against The Ohio Casualty Insurance Company ("Ohio Casualty") should also be dismissed. Ohio Casualty serves as the Sheriff Department's surety and is liable only to the extent that the Richmond County Sheriff's Department is liable. Accordingly, Plaintiff would only be justified in making a claim against Ohio Casualty should the Sheriff's Department fail to meet an obligation that has not been determined in this case. Therefore, Defendants' motion to dismiss all claims against Ohio Casualty should be granted. *Cranford*, 2007 WL 676687, at *3.

### I. Official Capacity Claims are Barred

Plaintiff has attempted to state a *Monell* claim by alleging injury from the Sheriff's customs and policies: "That proximately and solely as the result of the foregoing omission, policies, acts and customs of the Sheriff and Richmond County, Plaintiff suffered mental anguish in connection with the violation of his constitutional rights." (Compl., ¶ 37.) *See Monell v. Dep't of Social Services of New York*, 436 U.S. 658 (1978) (holding that municipalities and other local governments may be held liable under 42 U.S.C. § 1983 for any deprivation of constitutional rights caused by an official policy or governmental custom and usage not formally approved or authorized).

It is axiomatic that analysis of a law enforcement agency's customs and policies is unnecessary where the involved officers did not act unlawfully. As the United States Supreme Court has observed, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (emphasis in original); *see also Smith v. Atkins*, 777 F. Supp. 2d 955, 966 (E.D.N.C. 2011) ("As for count three, because there is no underlying constitutional violation, plaintiffs' claim in count three concerning defendants' customs, policies, practices, procedure, and training fails.").

## CONCLUSION

Plaintiff's claim challenging the entry and search of his house is without merit given the presence of exigent circumstances and also because the claim is barred by the statute of limitations. The malicious prosecution claim is without merit since there existed more than enough probable cause to charge and prosecute Plaintiff for the designated offenses. Moreover, at the very least, Defendants are entitled to qualified immunity. Therefore, Plaintiff presents no genuine issue of material fact in the claim before this court. For such reasons stated in this memorandum opinion, **IT IS RECOMMENDED** that Defendants' motion for summary judgment (Docket Entry 21) be **GRANTED**.

United States Magistrate Judge
Joe L. Webster

Durham, North Carolina
May 8, 2013